## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMPHENOL CORPORATION,<br><br>                    Plaintiff,<br><br>    v.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br><br>                    Defendant. | Case No.: |

### COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiff Amphenol Corporation ("Amphenol") brings this action for declaratory relief and damages for breach of contract against its "All Risks" insurer, Defendant Factory Mutual Insurance Company ("Factory Mutual"), which provided coverage expressly designed to respond to the types of losses occasioned by pandemic conditions.  This action is necessitated by Factory Mutual's failure to indemnify Amphenol against tens of millions of dollars in losses caused by the SARS-CoV-2 virus and the COVID-19 pandemic, or, indeed, even to state a coverage position. For its complaint, Amphenol alleges as follows:

### INTRODUCTION

1.      Amphenol is a manufacturer and distributor of electrical, electronic and fiber optic connectors and interconnect systems, antennas, sensors and sensor-based products and coaxial and high-speed specialty cable.

2.      Amphenol has operations in more than 40 countries around the world.

3.      Despite Amphenol's best efforts to navigate the pandemic, many of its businesses have incurred substantial physical loss or damage to property caused by the SARS-CoV-2 virus

and/or COVID-19, as well as losses from resulting suspensions and/or interruption of business activities.

4.     More specifically, Amphenol has incurred substantial losses caused by the actual presence at Amphenol facilities and/or third-party locations of the communicable disease ("COVID-19" or the "disease") and/or the underlying virus, SARS-CoV-2.

5.     Amphenol has incurred additional losses resulting from the ***threat*** posed to property and persons at Amphenol and/or third-party locations by the physical prevalence of the SARS-CoV-2 virus and COVID-19 in the communities in which Amphenol or its business partners (including customers, suppliers, contract manufacturers, and contract service providers) do business.  The threat of the SARS-CoV-2 virus spreading to Amphenol and non-Amphenol facilities has rendered many of the facilities, at least temporarily, unreasonably dangerous and/or unfit for their intended purposes until safe occupancy and operation can be assured through the undertaking of extraordinary remedial or preventative measures.

6.     These threats also resulted in an unprecedented number of governmental orders requiring, at various times and in various locations, shutdowns, lockdowns, facility closures, quarantines, travel restrictions, and operating restrictions, all of which substantially impacted the operations of both Amphenol and its business partners.

7.     The harms to Amphenol include direct physical loss and direct physical damage to property that has been adversely altered by the virus or that has been rendered unreasonably dangerous and/or unfit for its intended purpose; substantial time-element losses due to partial or complete facility closures, government-ordered suspensions of business activities, and supply chain interruptions due to the actual and/or the threatened presence of the virus and/or resulting disease; millions of dollars in extra expenses, logistical costs and expediting costs to safely resume

or continue business operations; substantial claims preparation costs; and other losses incurred across numerous Amphenol businesses and locations throughout the world.

8.     Amphenol is continuing to experience physical loss or damage to property and interruption of its business as the pandemic continues.  While Amphenol is continuing to assess the domestic and worldwide losses incurred by its businesses as of the date of this filing, the impact to date is believed to exceed $100 million in loss or damage to property and in lost business income that would not have occurred but for the pandemic.

9.     Amphenol fortunately had the foresight to purchase broad insurance protection against the potentially catastrophic risks posed by events such as a pandemic.  For a premium of more than $7.2 million, Amphenol procured broad "All Risks" coverage under Policy No. 1062608 (the "Policy") from Defendant Factory Mutual precisely to insure against the losses Amphenol has incurred and continues to incur.

10.     Among its many features, the All Risks coverage purchased from Factory Mutual includes specific coverage for property loss or damage and time-element losses caused by the actual on-site presence of "Communicable Diseases" such as COVID-19.

11.     The All Risks Policy goes even further, providing coverage designed to address the principal economic consequence of pandemics:  lockdowns, facility closures, and other interruptions triggered by the ***threat*** that ***off-site prevalence of the virus*** will spread to uninfected factories, offices, stores and other business locations that could become disease vectors if permitted to operate "as usual" during the pandemic.  Factory Mutual's Policy thus specifically addresses the principal economic harm arising from the highly unusual event of ***pandemic-caused interruptions*** to business, by providing coverage for losses resulting from the ***threat*** that the off-site virus will spread to covered Amphenol locations.

12. The Policy's coverage for **threat**-based interruptions to business (as opposed to interruptions resulting from the **actual or suspected** on-site presence of the SARS-CoV-2 virus) has been triggered here, as many Amphenol or non-Amphenol facilities experienced, for example, closures that were instituted as a response to the threat that local outbreaks of COVID-19 within five miles of Amphenol locations could spread to workplaces, such as Amphenol's and/or those of third parties.

13. Befitting the top dollar Amphenol paid for best-in-class insurance coverage, the Policy provides many other broad protections against a wide range of pandemic-related losses, including direct loss and damage to property and associated time-element loss, losses due to government-ordered shutdown, losses due to impaired ingress to or egress from Amphenol facilities, contingent time element losses, extra expenses and logistical costs to remain in business despite pandemic conditions, claims preparation costs, losses directly resulting from any communicable disease confirmed to be at Amphenol locations, and other forms of coverage.

14. In total, the Policy provides coverage of up to $500 million per occurrence for precisely the types of losses incurred by Amphenol and at issue in this action.

15. Even though Amphenol's past and ongoing losses fall within the Policy's coverages, Factory Mutual has failed to state whether it will or will not provide coverage. Moreover, while Amphenol awaits a coverage determination, Factory Mutual has declined to enter into any form of tolling agreement to ensure that Amphenol, on account of Factory Mutual's delay, does not lose the opportunity to seek coverage in court due to the expiration of potentially applicable limitations on the time for filing suit.

16. Further, Factory Mutual has denied coverage in other cases involving first-party claims for loss or damage to property and/or time-element losses resulting from the SARS-CoV-2

virus.  These denials in other cases, coupled with Factory Mutual's failure to render a coverage position, causes Amphenol to conclude that an actual controversy exists between the Parties concerning Amphenol's right to coverage for its COVID-19 related losses.

17.     As a consequence of Factory Mutual's failure to honor its coverage obligations under the Policy or to even state a coverage position, and its refusal to enter into a tolling agreement, Amphenol is now compelled to file this lawsuit for damages, declaratory relief, and other relief.

## PARTIES

18.     Plaintiff Amphenol Corporation is a Delaware corporation with its principal place of business in Wallingford, Connecticut.

19.     Defendant Factory Mutual Insurance Company is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.

## JURISDICTION AND VENUE

20.     Subject matter jurisdiction is conferred by 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00) and is between citizens of different states.

21.     Specifically and without limitation, the unpaid, covered damages incurred to date, and the future damages Amphenol expects to incur as covered losses under the Policy, and without taking into account attorney's fees, costs, interest, statutory penalties, or exemplary damages for which Factory Mutual is or may become liable, far exceed $75,000.00.

22.     Personal jurisdiction over Factory Mutual exists because it has sufficient minimum contacts with Connecticut.  Specifically, and without limitation, the Policy was issued to Amphenol, a Connecticut corporation, and delivered to Amphenol in Connecticut.

23.     Venue is proper under 28 U.S.C. § 1391 because the named insured under the Policy, Amphenol, was a resident of this judicial district at the time of policy delivery and remains a resident of this district, because Factory Mutual delivered the Policy in this district, and because a substantial quantity of the harm incurred as a result of the Factory Mutual conduct complained of in this Complaint occurred in this judicial district.

<strong>FACTUAL BACKGROUND</strong>

A.      <u>**AMPHENOL**</u>

24.     Amphenol is one of the world's largest designers, manufacturers and marketers of electrical, electronic and fiber optic connectors and interconnect systems, antennas, sensors and sensor-based products and coaxial and high-speed specialty cable.

25.     Amphenol's businesses operate on a global basis with factories, offices and other facilities in more than 40 countries, including the United States, Brazil, Canada, China, the Czech Republic, Denmark, Estonia, France, Germany, Hong Kong, Hungary, India, Indonesia, Ireland, Israel, Italy, Japan, Malaysia, Mexico, New Zealand, the Netherlands, Poland, the Republic of North Macedonia, Romania, Serbia, Singapore, Slovakia, South Korea, Spain, Sweden, Switzerland, Taiwan, Thailand, Tunisia, the United Arab Emirates, the United Kingdom, and Vietnam.

26.     Amphenol has numerous distinct business units, organized generally into the following seven Operating Groups:

      a.      Amphenol Military and Aerospace Group;

      b.      Amphenol Automotive Products Group;

      c.      Amphenol Industrial Products Group;

      d.      Amphenol Mobile Consumer Products Group;

      e.      Amphenol Information Communications and Commercial Products Group;

      f.      Amphenol RF, Optics and Broadband Group; and

      g.      Amphenol Interconnect and Sensor Systems.

27.     While the effects of COVID-19 have been felt in all of the Operating Groups, the adverse economic impact of the pandemic has most acutely affected three specific groups:  the Military and Aerospace Group, the Automotive Products Group, and the RF, Optics and Broadband Group.

**B.**     <u>**THE POLICY**</u>

28.     Factory Mutual provided coverage to Amphenol under Policy No. 1062608 (the "Policy") for the period January 1, 2020 to January 1, 2021.  *See* Policy at 1.

29.     The Policy "covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy."[1]  *See* Policy at 1.

30.     The Policy provides a wide range of coverages, with Factory Mutual agreeing to a "maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss" of "USD 500,000,000."  *See* Policy at 4.

31.     The applicable coverages provided by the Policy include but are not limited to the following:

      a.     **Direct Property Loss/Damage Time Element Losses**:  The Policy provides coverage of up to $500 million per occurrence for "PHYSICAL LOSS OR DAMAGE" to specific Amphenol property, as well as "Time Element loss" "directly resulting from physical loss or damage of the type insured."

      b.     **Losses Due to Orders of Civil Authority**:  The Policy provides up to $500 million per occurrence for losses "incurred by the Insured" if "an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical

---

[1] All quotations from the Policy retain emphasis therein, including capitalized and bolded terms, unless otherwise noted.  All other emphasis in quoted material is noted.

damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it."

c. **Losses Due to Impairment of Ingress or Egress**:  The Policy provides up to $500 million per occurrence for losses "incurred by the Insured" due to the "necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided such prevention is a direct result of physical damage of the type insured to property of the type insured."

d. **Contingent Time-Element Losses**:  The Policy provides up to $50 million per occurrence for losses "incurred by the Insured" that directly result from "physical loss or damage of the type insured at **contingent time element locations**," *e.g.*, physical loss or damage to property at locations of Amphenol suppliers, vendors or customers.

e. **Response Costs and Interruption/Time Element Losses Due to Communicable Disease Confirmed at Amphenol Locations**:  The Policy provides up to $1,000,000 or more for cleanup, removal and/or disposal of property impacted by the actual presence of communicable diseases, as well as interruption/time-element losses due to the actual presence of such communicable disease.

f. **Expediting Costs and Extra Expenses**:  The Policy provides up to $100 million per occurrence in combined coverage for expediting costs and extra expense incurred by Amphenol to minimize losses.

g. **Logistics Extra Costs**:  The Policy also provides up to 200% of normal costs for 180 days to cover the extra logistical costs to minimize losses incurred by Amphenol as a result of a covered occurrence.

h. **Claims Preparation Costs**:  The Policy provides up to $250,000 plus 50% of the amount above $250,000 incurred by Amphenol to produce and certify any "particulars or details" Factory Mutual requires for purposes of submission of its claim to Factory Mutual.

*See* Policy at 1, 4-9, 26-27, 29, 42-63.

32.     The Policy provides coverage on a world-wide basis, *see* Policy at 2, with the specific locations covered by the Policy including, without limitation, those on the Schedules of Locations attached as Appendix A and Appendix B to the Policy.

33.   The Policy contains a so-called "Contamination Exclusion" that provides as follows:

> D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> > 1)   **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

*See* Policy at 18.   The Policy in turn defines "**contaminant**" as "anything that causes "**contamination**" and defines "**contamination**" as:

> any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

*See* Policy at 76.

34.   The Contamination Exclusion does not apply to Amphenol's losses caused by the pandemic, for numerous reasons, including but not limited to the following:

> a.   **Inapplicable to the presence of virus brought on to the premises by persons with COVID-19**:  The Contamination Exclusion contains an important exception providing that coverage is ***available*** if "the actual not suspected presence of **contaminant(s)** *directly results from other physical damage not excluded by this Policy*."  Policy at 18 (italics added).  Persons who contract the Communicable Disease of COVID-19 did so as a consequence of being exposed to property that was adversely impacted by the SARS-CoV-2 virus; and, as noted, the Policy does not exclude coverage for physical damage resulting from "Communicable Disease."  Accordingly, to the extent loss results from infected persons bringing the SARS-CoV-2 virus onto Amphenol locations, any resulting impact to Amphenol property results from "other physical damage not excluded by this Policy" and therefore is not subject to the Contamination Exclusion.

9

b.   **Inapplicable to loss or damage to property caused by the "threat" of virus becoming present at a location**:   The exclusion applies only to "**contamination**," which is limited to the "actual or suspected presence" of specified substances at a location.   *See* Policy at 18, 76.   By its express terms, the Contamination Exclusion does not apply to losses caused by closures and other measures responding to "threatened" presence of virus.

c.   "**Contamination" Exclusions apply to traditional pollution, not to natural catastrophes such as disease outbreaks**:   To the extent the SARS-CoV-2 virus is actually present or suspected of being present at an Amphenol facility, its presence would be the result of a natural process, as opposed to an act of pollution or contamination.   So-called "contamination" exclusions, such as the form of Contamination Exclusion in the Policy, apply only to situations that reasonable policyholders would understand to constitute *polluting* activities, as opposed to natural catastrophes such as the COVID-19 pandemic.

d.   The permissive language of the so-called Contamination Exclusion stands in stark contrast with standard-form "virus exclusions" that are found in many other, less generous policy forms issued throughout the insurance industry.   Indeed, as a means of collecting higher premiums from and attracting desired customers such as Amphenol, Factory Mutual eschewed many other standard-form virus exclusions that have been widely available since 2006, when the Insurance Services Office published and circulated an explicit virus exclusion (the "ISO Virus Exclusion") stating "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."   Rather than using an explicit virus exclusion, Factory Mutual instead opted for an exclusion that barred only virus-related damage that could fairly be described as resulting from an act of "contamination" or "pollution"; and even then, Factory Mutual further limited the scope of the Contamination Exclusion by also permitting coverage if the "contamination" is not actually at an insured location or suspected to be at an insured location, or if the contamination itself resulted from a covered instance of loss or damage to property.

e.   The Contamination Exclusion excludes only "contamination, and any *cost* resulting from contamination," Policy at 18 (italics added), but makes no mention of "losses" and does not purport to exclude "loss or damage to property" resulting from Contamination.   Thus, the Contamination Exclusion is expressly directed solely at any costs incurred to remove the contamination from covered property, but not to consequential economic losses such as, *e.g.*, time-element losses or extra expenses.

f.   The Contamination Exclusion is directed solely at "conditions of property" and thus does not address, *e.g.*, time-element losses due to civil authority

orders or impairment of ingress or egress occasioned by covered Communicable Disease.

35.     In short, the Policy reflects Factory Mutual's deliberate decision to exclude only virus contamination resulting from acts of pollution (such as inadvertent or deliberate releases of waste streams from a lab, water-treatment plants, or other facilities).   The Contamination Exclusion is inapplicable to any of the SARS-CoV-2-virus-related losses that Amphenol incurred as a consequence of the COVID-19 pandemic.

**C.     THE SARS-COV-2 VIRUS AND THE COVID-19 GLOBAL PANDEMIC**

36.     The SARS-CoV-2 virus was identified in China in late 2019 or January 2020 as the cause of a severe respiratory illness known as COVID-19.

37.     Starting on or about January 23, 2020, the government of China attempted to control the spread of the SARS-CoV-2 virus by issuing orders that had the effect of restricting travel and business activities in almost all areas of China.   This initial order soon resulted in shutdowns of most Chinese factories and commercial facilities for at least three weeks, with resulting interruptions in the global supply chain and predictable negative impacts on worldwide commerce.   In many parts of China, this three-week shutdown period was extended and the re-opening of facilities throughout China ramped up slowly thereafter through the end of the first quarter of 2020.

38.     Shortly after January 23, 2020, Amphenol began to incur covered time-element losses as a result of these initial orders.

39.     Since January 2020, the SARS-CoV-2 virus has spread across the globe, resulting in a worldwide pandemic that has caused tens of millions of infections and at least two million deaths.

40.     Governmental authorities and private companies (including Amphenol) and individuals have taken actions in response to the SARS-CoV-2 virus and the COVID-19 pandemic. These actions have included, without limitation:

a.      Governmental orders of various kinds, including:

i.      Orders restricting or prohibiting travel both internationally and within national borders;

ii.     Quarantine orders applicable to individuals infected by or potentially exposed to the SARS-CoV-2 virus, whether or not infected or symptomatic;

iii.    Orders closing or limiting business facilities confirmed to have experienced the actual presence of either the SARS-CoV-2 virus or confirmed cases of COVID-19 at their premises;

iv.     Orders closing businesses or limiting commercial activity at locations without the confirmed or suspected presence of the SARS-CoV-2 virus but without any actual or suspected cases of COVID-19 at their premises, based on their geographic proximity to places where the SARS-CoV-2 virus was confirmed to be present, where cases of COVID-19 occurred, and where property loss or damage has resulted from the presence of the SARS-CoV-2 virus.

b.      Responses of various kinds by private business (including Amphenol), including but not limited to:

i.      **Remediating or Replacing Physical Property Adversely Altered by the SARS-CoV-2 Virus Adhering to the Property**: Remediation and/or disposal and/or replacement of personal property and real property that had been physically contacted and adversely altered by virus-containing materials (including respiratory particles, phlegm, and other materials) expelled by persons with COVID-19;

ii.     **Business Shutdowns Due to Either the Virus (SARS-CoV-2) *or* the Resulting Disease (COVID-19) Being Present at a Location**: When disease outbreaks occur at a facility, or when other circumstances create a suspicion that the SARS-CoV-2 virus is present, a common and necessary response is to shut down the facility and undertake remedial efforts;

iii.    **Time Element Loss Due to the SARS-CoV-2 Virus and/or COVID-19 Being in the Community (Even if *Not* at the Business Location)**:  Suspension of business activities due to business

12

premises being rendered unreasonably dangerous for occupancy and unfit for their ordinary or intended purposes (even in cases in which SARS-CoV-2 virus and/or COVID-19 was neither actually present nor suspected to be present at the business location), due to pandemic conditions and the threat posed by SARS-CoV-2 virus and/or COVID-19 in general geographic proximity (*i.e.*, within five miles) of the business location;

iv.   **Extra Expenses to Remain Operational Even With COVID-19 at the Business Location**:   Undertaking out-of-the-ordinary activities and expenses, such as testing, protective equipment, reconfiguration of work spaces for social distancing, reduced or staggered schedules, facilitation of remote work, etc., in order to continue operations at a business location or at replacement locations and to mitigate the effects of shutdowns or slowdowns caused by the actual presence of COVID-19 at a facility;

v.   **Extra Expenses and Expediting Costs to Remain Operational Even With the SARS-CoV-2 Virus and/or COVID-19 Being in the Community (Even if Not at the Business Location)**: Undertaking out-of-the-ordinary activities and expenses, such as testing, protective equipment, reconfiguration of work spaces for social distancing, reduced or staggered schedules, facilitation of remote work, etc., in order to render business premises safe for occupancy and fit for their ordinary purpose or intended purposes (even in cases in which the SARS-CoV-2 virus and/or COVID-19 was neither actually present nor suspected to be present at the business location), due to pandemic conditions and the threat posed by the SARS-CoV-2 virus and/or COVID-19 in geographic proximity to the business location;

vi.   **Logistics Costs**:   Addressing the disruption of the normal movement of goods and materials between business locations and/or vendor or customer locations; and

vii.   **Claims Preparation Costs**:  Retention of outside financial and operational experts to document and calculate losses arising from the SARS-CoV-2 virus and/or COVID-19.

**D.   THE SARS-COV-2 VIRUS HAS PARTICULAR QUALITIES THAT MAKE IT UNIQUELY DANGEROUS TO HUMAN HEALTH AND DEVASTATING TO BUSINESSES AND ECONOMIES**

41.   The SARS-CoV-2 virus is a respiratory virus that causes COVID-19 (as opposed to its variant, the SARS-CoV-1 virus, which caused the SARS pandemic in the early 2000s).

COVID-19 is a dangerous and potentially fatal communicable disease.  The SARS-CoV-2 virus can be transmitted by human-to-human contact, airborne viral particles in ambient air, and contact with affected surfaces or objects.  According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing droplets that can span as far as 23 to 27 feet.  The United States Centers for Disease Control and Prevention ("CDC") has stated that the SARS-CoV-2 virus is most likely to spread person-to-person when people are within six feet of each other, but has acknowledged that the virus also may spread from an infected person who is more than six feet away or even who has left a given space.

42.    The SARS-CoV-2 virus is uniquely dangerous, for reasons that include the following:

- Many viruses do not cause communicable diseases; SARS-CoV-2 does cause communicable disease.

- Many viruses do not infect humans; SARS-CoV-2 does infect humans.

- Even among viruses that infect humans, many are incapable of direct transmission from human to human; SARS-CoV-2 is capable of human-to-human transmission.

- Even among viruses that transmit between humans, many do not threaten serious illness or any illness at all; SARS-CoV-2 poses a substantial threat of serious illness and even death.

- Even among viruses that can cause serious human illness, many are not contagious until after the carrier has become symptomatic, thus allowing affected individuals to isolate themselves before spreading the virus.  By contrast, SARS-CoV-2 has been shown to be transmittable during a pre-

symptomatic incubation period of up to 21 days before symptoms appear; even more worrisome, the SARS-CoV-2 virus is transmittable by the estimated 40% to 70% of human carriers who ***never*** exhibit any symptoms. Whether or not symptoms of COVID-19 ever appear, human carriers of SARS-CoV-2 are believed to be especially contagious during the "pre-symptomatic incubation" period due to high viral loads coupled with a lack of awareness that they are infected and must isolate.

- Finally, few if any viruses have resulted in the widespread illness, death, loss and damage to property, and economic devastation already wrought by SARS-CoV-2 (and new variants of the virus have evolved during this crisis that appear to be worsening and/or extending the pandemic).

Thus, unique among viruses, SARS-CoV-2 has caused unprecedented levels of illness, death, and global economic calamity.

**E.  WHEN SARS-COV-2 VIRAL PARTICLES COME IN CONTACT WITH PROPERTY, THAT PROPERTY SUFFERS ACTUAL PHYSICAL DAMAGE (INCLUDING ADVERSE ALTERATION)**

43.  To understand why the SARS-CoV-2 virus has had such devastating health consequences and also has resulted in so much physical loss and damage to property and so many government-ordered or privately undertaken business shutdowns, one must understand the manner in which the virus interacts with the physical environment and why SARS-CoV-2 triggers the insurance protection provided by Factory Mutual for exactly these types of losses.

44.  The SARS-CoV-2 virus is expelled from the mouth and/or nose, and it travels within respiratory droplets when humans cough, sneeze, scream, sing, or even speak loudly or breathe heavily.

45.     Mouth and nose secretions, including saliva, nasal discharge, and respiratory secretions such as mucus, form an aerosol cloud in the surrounding air.  The expelled aqueous droplets contain multiple copies of suspended infectious SARS-CoV-2 viral particles.  The mouth- and nose- emitted droplets are approximately spherical in shape and widely vary by size.  Scientific literature somewhat arbitrarily divides these droplets into "small" droplets (those less than about 5 microns in diameter) and "large" droplets (those exceeding about 5 microns in diameter). Because the SARS-CoV-2 viral particle diameter is roughly 100 nanometers (*i.e.*, 0.1 microns) even a 5-micron respiratory droplet can easily accommodate ***many thousands*** of SARS-CoV-2 viral particles.

46.     Droplet *size* is the most important determinant of aerosol behavior, including the length of travel of the expelled respiratory droplets.  Large droplets (as defined above) within an aerosol plume are strongly affected by gravity; for example, 50- to 100-micron droplets typically will travel only up to a couple of meters before they fall to the ground or land on another surface. In contrast, small droplets (as defined above) can remain airborne almost indefinitely under most indoor conditions and can travel with air currents long distances.  Whatever their size, virus-containing droplets eventually encounter physical objects and surfaces (called fomites) and can settle there.

47.     Once expelled from the mouth and/or nose, aqueous droplets, including virus-containing ones, can attach to surfaces.  The suspended viral particles can then themselves collide with the surface and nonspecifically adsorb to it (*i.e.*, form a noncovalent chemical bond with the surface).  Furthermore, the landed droplet's water will undergo evaporation, and eventually some fraction of the viral particles may end up being deposited onto the surface either directly or indirectly (*i.e.*, through other solids contained in the droplet).

48.     There is a distinction between viral particles that are ***adsorbed*** to a host surface and those simply ***deposited*** onto it.  In the former case, as stated above, there is an actual chemical bond (albeit a relatively weak one) between the viral particle and the surface; in this scenario, the virus particle is relatively hard to detach.  In contrast, the deposition entails merely a physical presence of the viral particle on the surface (akin to spilled flour) and is readily reversible; in this instance, the virus is relatively easy to remove from the surface.

49.     In addition, there are various intermediate scenarios in between the virus being adsorbed and merely deposited.  For example, some endogenous polymeric molecules present in respiratory droplets (such as polysaccharides and proteins) may act as a "bridge" binding the virus to the surface.  Also, electrostatic attraction between the surface and the viral particles may play a role in addition to basic gravity.  Furthermore, porous objects like fabrics represent a special case because they may entrap viral particles, thus making them hard to access, inactivate, or remove. In this case, the original respiratory droplets are first absorbed by the fabric; once their water subsequently evaporates, the viral particles become embedded and entangled within the bulk of the object.

50.     The type of bond that forms between viral particles and physical objects varies depending on the type of object, and often markedly so.  The interaction of ***both*** the virus-containing respiratory aqueous droplets ***and*** the viral particles themselves with surfaces depends on the nature of the latter.  For example, when it adheres to a clean glass (or another hydrophilic) surface, an aqueous droplet spreads out; this increases the droplet's footprint on the surface and facilitates evaporation of the moisture.  In contrast, when an aqueous droplet lands on plastic objects (or other objects with hydrophobic or greasy surfaces), it beads up, thereby minimizing its contact area and diminishing the evaporation.  Likewise, the viral particle's propensity to adsorb

to a surface strongly depends on the nature of the latter:  in general, one would expect the tendency of the viral particles to adsorb to be more pronounced in the case of hydrophobic, as opposed to hydrophilic, surfaces.  Furthermore, whether an adhered (deposited, adsorbed, or in between) viral particle remains stuck to the surface and, if so, whether it retains its infectivity should depend on the properties of the host surface as well.

51.     With respect to the retention of the viral particles on the surface, numerous **additional** factors (*i.e.*, those besides the type of the host object) may have a substantial effect: how smooth and clean the surface is, temperature, relative humidity, and airflow (*e.g.*, ventilation).

52.     The bond between viral particles and physical objects persists until broken through intervening forces.  An effective way to break the bond between the viral particles and a surface they have adhered to is to wash the surface with water containing detergents (*e.g.*, soapy water) or organic solvents, such as alcohol (ethanol).  In doing so, energetic rubbing will be more effective in removing the viral particles than gentle flushing.  The underlying mechanisms here are that physically deposited viral particles can be washed off and adsorbed ones can be desorbed by such treatments.  While some disinfectants, such as aqueous detergents, can both inactivate the virus and remove it from surfaces, some others, like fumigants and ultraviolet light, only inactivate.

53.     If left undisturbed, the virus-surface bond will persist.  Whether adsorbed or simply physically deposited (and in various intermediate scenarios), viral particles will remain on the surface indefinitely if left undisturbed.  Some studies suggest that SARS-CoV-2 can be detected on certain surfaces many weeks after infected persons have departed, with the SARS-CoV-2 virus remaining viable for as long as seven days on a range of common surfaces, including plastic, stainless steel, glass, and wood; other researchers have found viable SARS-CoV-2 samples on glass, stainless steel, and paper currency for up to approximately a month under indoor conditions.

54.     Physical objects that have been altered through the formation of a bond with viral particles are dangerous.  Humans can become infected by touching, or otherwise coming in contact with, an object to which viral particles have attached for as long as the virus remains infective.  In fact, this is one of the three recognized main mechanisms of spreading COVID-19; the other two are a direct transmission from an infected person to people in close proximity via large respiratory droplets ("person-to-person transmission"; if inhaled, such large droplets deposit primarily in the upper airways of the head and neck) and also an indirect transmission via small aerosol particles traveling over long distances ("airborne transmission"; if inhaled, such small droplets deposit primarily in the lower respiratory tract).  When a person touches a surface containing an infectious virus and then his/her mouth, eyes, or nose, the person may become infected.  Which of these three disease transmission mechanisms is dominant varies widely and is highly circumstance-specific.

55.     Airborne transmission can be exacerbated through HVAC systems that are defective and rendered unreasonably dangerous through the absorption and then redistribution of SARS-CoV-2 viral particles across entire buildings, with studies finding wide dispersion of the SARS-CoV-2 virus and confirmed presence on ceiling vent openings, vent exhaust filters, ductwork and other surfaces more than 50 meters from the original human source.

56.     By bonding with, and becoming part of, the property that it comes in contact with, the SARS-CoV-2 virus adversely alters the physical object, as well as the facility or building in which that object is located.  Both the object and the building are transformed from safe for occupancy and commercial activity to property that is uninhabitable, unfit for its intended purpose, dangerous and, indeed, potentially deadly.  In short, the property is physically damaged.  And even the owners of personal property or buildings that are potentially infected or under threat of infection if used or occupied during a pandemic have effectively incurred a loss to property,

because – simply put – the personal property or buildings are no longer safe, habitable or fit for their intended purpose until the pandemic conditions have been controlled and ultimately eliminated.

**F.      THE IMPACT OF THE COVID-19 PANDEMIC ON AMPHENOL'S BUSINESSES**

57.      As a consequence of the global pandemic, Amphenol has undertaken the activities identified in Paragraph 40(b)(i)-(vii), at substantial cost.

58.      Amphenol has incurred substantial loss – including but not limited to loss or damage to property, time-element losses, Extra Expenses, Expediting Costs, Logistics Costs, and Claims Preparation Expenses – as a result of the presence of COVID-19 at various of its facilities.

59.      Numerous Amphenol facilities have incurred covered loss or damage to property, time-element losses due to government or private closures or suspensions of business, loss of ingress or egress, losses due to Communicable Disease, Extra Expenses, Expediting Costs, and/or Logistics Costs.

60.      Amphenol has incurred substantial loss – including but not limited to physical loss or damage to property, time-element losses, Extra Expenses, Expediting Costs, Logistics Costs, and Claims Preparation Expenses – even in cases in which the SARS-CoV-2 virus and/or COVID-19 was neither actually present nor suspected to be present at the business location, due to pandemic conditions and the threat posed by the SARS-CoV-2 virus and/or COVID-19 in general geographic proximity (*i.e.*, within five miles/eight kilometres) of the business location.

61.      The Policy provides several different types of coverages applicable or potentially applicable to Amphenol's past, current and future COVID-19 losses, including the following.

         **1.      Loss or Damage to Property and Direct Time Element Losses**:

62.      The Policy provides coverage of up to $500 million per occurrence for physical loss or damage to Real Property and/or Personal Property (as defined in the Policy), unless such

property is excluded or results from an excluded cause of loss.  This coverage extends to physical loss or damage to covered property caused by the presence of the SARS-CoV-2 virus and/or incidences of COVID-19 at specific Amphenol locations.

63.     Amphenol has incurred substantial covered losses as a consequence of loss or damage to its property as a result of direct exposure of (and actual adverse physical alteration of) its own covered Real Property and Personal Property.  This actual adverse physical alteration of its property as a result of the SARS-CoV-2 virus adhering to the property has resulted in loss due to the adherence of the SARS-CoV-2 virus to physical property and resulting adverse alteration of the property, requiring either remediation or disposal and replacement.

64.     This coverage also extends to physical loss to covered property as a result of the **threat** of SARS-CoV-2 becoming present at Amphenol locations and the resulting danger posed by such locations becoming a disease vector for COVID-19.  Such **threat of virus** has caused covered loss both at Amphenol locations and the property of third parties (such as Amphenol's customers, suppliers, contract manufacturers, and contract service providers).

65.     The Policy also covers "Time Element" loss as a result of the SARS-CoV-2-virus-related physical loss or damage described above.

66.     Under those Time Element coverages, the Policy permits Amphenol to elect to make a claim based on either:   "a) GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or b) GROSS PROFIT[.]"  *See* Policy at 43.

67.     Amphenol is entitled to recover its covered losses with respect to physical loss or damage to its property, and resulting Time Element losses, up to the limits provided in the Policy.

68.     Factory Mutual has not paid Amphenol for any of its covered Property Damage or Time Element losses.

2.      **Losses Due to Orders of Civil Authority**:

69.     The Policy provides up to $500 million per occurrence for losses resulting from the temporary closure or suspension of activities at Amphenol's insured locations as a result of orders of civil or military authority occasioned by SARS-CoV-2-virus-caused damage to property of the type covered under the Policy near covered locations.

70.     The applicable language of the Policy describing this coverage includes the following:

**A.      CIVIL OR MILITARY AUTHORITY**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)      starting at the time of such physical damage; and

2)      ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

*See* Policy at 54.

71.     The Policy provides for 45 consecutive days of coverage for losses due to Orders of Civil or Military Authority.  *See* Policy at 4.

72.     The coverage applies separately with respect to each particular Order of Civil or Military Authority.

73.     Amphenol is entitled to recover separately for each Order of Civil or Military Authority affecting a particular covered location.

74.     Amphenol has incurred substantial covered losses due to Orders of Civil or Military Authority that were entered as a consequence of damage to property of Amphenol and/or to property belonging to third parties.  Such damage to property was of the type covered under this policy (including, without limitation, (a) damage to property caused by communicable disease (*i.e.,* COVID-19), (b) damage to property caused by exposure to the SARS-CoV-2 virus, and (c) damage to property caused by the threat of exposure to the SARS-CoV-2 virus).  Such damage to property occurred within five statute miles/eight kilometres of the covered Amphenol locations incurring the covered losses due to the Orders of Civil or Military Authority.

75.     Amphenol is entitled to recover its covered Civil or Military Authority losses, up to the limits provided in the Policy.

76.     Factory Mutual has not paid Amphenol for any of its covered Civil or Military Authority losses.

### 3.     <u>Losses Due to Impairment of Ingress or Egress</u>:

77.     The Policy provides up to $500 million per occurrence for time-element losses due to the prevention of ingress to or egress from covered locations.  Due to restrictions on travel or movement occasioned by SARS-CoV-2-virus-caused loss or physical damage to property, time element losses have been incurred.

78.     The applicable language of the Policy describing this coverage includes the following:

### C.    INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions:  As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)    lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)    picketing or other action by strikers except for physical damage not excluded by this Policy.

3)    physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)    starting at the time of such physical damage; and

2)    ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

*See* Policy at 55-56.

79.    Amphenol has incurred substantial covered losses due to Loss of Ingress or Egress as a consequence of COVID-19.

80.     Amphenol is entitled to recover its covered Ingress-Egress losses, up to the limits provided in the Policy.

81.     Factory Mutual has not paid Amphenol for any of its covered Ingress-Egress Losses.

### 4.     **Contingent Time-Element Losses**:

82.     The Policy provides up to $50 million per occurrence for time-element losses resulting from physical loss or damage of the type insured to property of Amphenol's direct customers, suppliers, contract manufacturers, contract service provider (and the direct or indirect customers, suppliers, contract manufacturers or service providers of the foregoing), and companies under a royalty, licensing fee or commission agreement with Amphenol.

83.     The applicable language of the Policy describing this coverage includes the following:

> **B.     CONTINGENT TIME ELEMENT EXTENDED**
>
> This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at contingent time element locations located within the TERRITORY of this Policy.
>
> As respects CONTINGENT TIME ELEMENT EXTENDED:
>
> 1)     Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:
>
> > CIVIL OR MILITARY AUTHORITY
> > CONTINGENT TIME ELEMENT EXTENDED
> > DATA SERVICE PROVIDER TIME ELEMENT
> > DELAY IN STARTUP
> > EXTENDED PERIOD OF LIABILITY
> > INGRESS/EGRESS
> > ON PREMISES SERVICES
> > SERVICE INTERRUPTION TIME ELEMENT

2)      The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)      TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions:  As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)      lack of incoming or outgoing transmission of voice, data or video.

2)      **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in the **Pacific Northwest Seismic Zone**.

3)      physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

*See* Policy at 55.

"**Contingent time element location**" is defined as follows:

A.      any **location**:

1)      of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

2)      of any company under a royalty, licensing fee or commission agreement with the Insured;

B.      any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

*See* Policy at 76.

84.    Numerous of Amphenol's direct customers, suppliers, contract manufacturers, contract service provider (and the direct or indirect customers, suppliers, contract manufacturers or service providers of the foregoing), and companies under a royalty, licensing fee or commission agreement with Amphenol have incurred physical loss or damage of the type covered by this Policy at their respective "**contingent time-element locations**."

85.    Amphenol has incurred substantial covered Contingent Time-Element Losses as a consequence of such physical loss or damage of the type covered by this Policy at their respective "**contingent time-element locations**."

86.    Amphenol is entitled to recover its covered Contingent Time Element Losses, up to the limits provided in the Policy.

87.    Factory Mutual has not paid Amphenol for any of its covered Contingent Time Element Losses.

## 5.    Response Costs Due to Communicable Disease Confirmed at Amphenol Locations

88.    As an additional coverage, the Policy provides up to $1,000,000 or more for response costs incurred as a result of presence of communicable disease such as COVID-19.

89.    The applicable language of the Policy describing this coverage includes the following:

### G.    COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)    an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)    a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease,

this Policy covers the reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of **communicable disease** for the:

1)    cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2)    actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions:   As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)    **terrorism**.

*See* Policy at 27.

90.    COVID-19 qualifies as a "Communicable Disease" under the Policy.

91.    The actual presence of COVID-19 has been confirmed at Amphenol locations.

92.    These locations have incurred costs for the cleanup, removal and disposal of the actual not suspected presence of COVID-19 from insured property.

93.    These costs are covered under the Policy, up to the limits of such Communicable Disease coverage.

94.     Factory Mutual has not paid Amphenol for these costs resulting from the actual presence of COVID-19 at Amphenol facilities.

### 6.     Interruption Costs Due to Communicable Disease Confirmed at Amphenol Locations:

95.     The Policy provides up to $1,000,000 or more for interruption/time-element losses incurred as a result of the actual presence of communicable disease such as COVID-19.

96.     The applicable language of the Policy describing this coverage includes the following:

### E.     INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)     an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)     a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)     the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2)     loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not

insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)      starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2)      ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

*See* Policy at 61-62.

97.    COVID-19 qualifies as a "Communicable Disease" under the Policy.

98.    The actual presence of COVID-19 has been confirmed at Amphenol locations.

99.    These locations have incurred interruption/time-element losses as a result of the actual not suspected presence of COVID-19 at insured property.

100.    These interruption/time-element losses are covered under the Policy, up to the limits of such Communicable Disease coverage.

101.    Factory Mutual has not paid Amphenol for these interruption/time-element losses resulting from the actual presence of COVID-19 at Amphenol facilities.

### 7.    **Expediting Costs and Extra Expenses:**

102.    The Policy provides up to $100 million per occurrence in coverage for Expediting Costs and Extra Expenses incurred by Amphenol to minimize covered losses.

103.    The applicable policy language describing this coverage includes the following language applicable to Expediting Costs incurred to expedite the repair or replacement of physically damaged property:

### M.    EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)    for the temporary repair of insured physical damage to insured property;

2)    for the temporary replacement of insured equipment suffering insured physical damage; and

3)    to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

*See* Policy at 29.

104.    The applicable Policy language describing this coverage includes the following language applicable to Extra Expense incurred to temporarily continue business as nearly normal as practicable and other related expenses:

### D.    EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)    extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)    extra costs of temporarily using property or facilities of the Insured or others; and

3)    costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss

or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions:  As respects EXTRA EXPENSE, the following applies:

1)  TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)  The following additional exclusions apply:

This Policy does not insure:

a)  any loss of income.

b)  costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)  costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)  any expense recoverable elsewhere in this Policy.

*See* Policy at 46-47.

105.   Amphenol has incurred substantial covered Expediting Costs and Extra Expenses in order to minimize covered losses relating to COVID-19.

106.   Amphenol is entitled to recover its covered Expediting Costs and Extra Expenses incurred to minimize covered losses, up to the limits provided in the Policy.

107.   Factory Mutual has not paid Amphenol for any of its Expediting Costs and Extra Expenses incurred to minimize covered losses.

8.      **<u>Logistics Extra Costs</u>**:

108.    The Policy also provides up to 200% of normal costs to cover the extra logistics costs incurred by Amphenol as a result of the SARS-CoV-2 virus to goods and materials between its locations and/or to the locations of its suppliers, customers or other business partners.

109.    The applicable policy language describing this Logistics Costs coverage includes the language contained in the "Logistics Extra Costs" section of the Policy, which is found at pages 56-58 of the Policy but, due to its length, is set forth only in part here:

> **D.      LOGISTICS EXTRA COST**
>
> This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:
>
> 1)      directly between insured locations; or
>
> 2)      directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,
>
> provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.
>
> Measurement of Loss:
>
> The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:
>
> 1)      extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.
>
> This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

*See* Policy at 56-57.

110.    Amphenol has incurred substantial covered Logistics Extra Costs as a consequence of COVID-19.

111.    Amphenol is entitled to recover its covered Logistics Extra Costs, up to the limits provided in the Policy.

112.    Factory Mutual has not paid Amphenol for any of its covered Logistics Extra Costs.

**9.    Claims Preparation Costs:**

113.    The Policy provides up to $250,000 plus 50% of the amount above $250,000 incurred by Amphenol to investigate, calculate and document its loss for purposes of submission of its claim to Factory Mutual.

114.    The applicable policy language describing this Claims Preparation Costs coverage includes the following language:

**E.    CLAIMS PREPARATION COSTS**

This Policy covers the actual costs incurred by the Insured:

1)      of reasonable fees payable to the Insured's:  accountants, architects, auditors, engineers, or other professionals; and

2)      the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)      attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)      loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

*See* Policy at 26.

115.    Amphenol has incurred substantial covered Claims Preparation Costs in connection with its COVID-19 losses.

116.    Amphenol is entitled to recover its covered Claims Preparation Costs, up to the limits provided in the Policy.

117.    Factory Mutual has not paid Amphenol for any of its Claims Preparation Costs.

### 10.    Other Available Coverages

118.    The foregoing is not intended to be an exhaustive list of the various coverages available to Amphenol under the Policy.

### G.    FACTORY MUTUAL HAS FAILED TO PAY OR EVEN RENDER A COVERAGE DETERMINATION, NOTWITHSTANDING AMPHENOL'S COMPLIANCE WITH THE POLICY AND CLEAR ENTITLEMENT TO COVERAGE

119.    Amphenol timely provided notice of loss to Factory Mutual on or about March 26, 2020.

120.    Amphenol timely provided an initial proof of loss to Factory Mutual on a mutually agreed date of December 16, 2020, while noting that its losses were still being assessed and remained ongoing due to the continuing COVID-19 pandemic, and that the proof of loss must therefore be considered provisional and interim.

121.    Amphenol has complied with all terms, conditions and requirements of the Policy or is excused from doing so, as Factory Mutual has waived or is estopped from enforcing such terms, conditions and requirements of the Policy.

122.    Notwithstanding Amphenol's timely compliance, Factory Mutual to date has failed to pay Amphenol's claim or any part of the claim.  Indeed, despite Amphenol's paying Factory Mutual more than $7.2 million in annual premiums, Factory Mutual has failed even to tell Amphenol whether it intends to cover these losses or to render a coverage determination.

123.    Moreover, Factory Mutual has also refused even to enter into a tolling agreement that would relieve Amphenol of any potential need to file a coverage lawsuit within one year of the onset of loss, even though the loss remains ongoing and Factory Mutual has not even indicated whether it intends to contest coverage.  As a consequence, to protect its rights and to obtain the insurance coverage for which it has paid, and that Factory Mutual agreed to provide, Amphenol brings this lawsuit.

### FIRST CAUSE OF ACTION
### *(Declaratory Relief)*

124.    Amphenol repeats and realleges the allegations in the preceding paragraphs.

125.    Amphenol is entitled to coverage under the Factory Mutual Policy for its existing and ongoing COVID-19 losses, as described in this Complaint and as to be proven at trial.

126.    On information and belief, Factory Mutual contends otherwise, at least in part.  At a minimum, Factory Mutual's failure to articulate a position on coverage and its failure to pay Amphenol any amounts for its losses to date gives rise to a reasonable inference that Factory Mutual contends it does not have an obligation to cover Amphenol's losses arising from the pandemic under the Policy, as described in the preceding paragraphs.

127.    An actual controversy therefore presently exists between Amphenol and Factory Mutual with respect to the duties and obligations of Factory Mutual under the Policy and with regard to Amphenol's entitlement to coverage.  Among other issues on which, upon information and belief, an actual controversy exists, Amphenol seeks declarations from this Court that include, without limitation:

      a.    Each coverage provision identified in the preceding paragraphs is triggered by Amphenol's claims;

      b.    All conditions precedent under the Policy have been satisfied or excused, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the Policy;

c.     No exclusion in the Policy applies to preclude or limit coverage for Amphenol's claims;

d.     Policy Exclusion D.1 (the Contamination Exclusion):

    i.     does not apply to loss or damage to property or time element loss arising from the actual or suspected physical exposure of property to the SARS-CoV-2 virus where such exposure was caused by a person who had been infected with COVID-19 through exposure to property damaged by SARS-CoV-2;

    ii.    does not apply to loss to property or time-element loss arising from the threat of SARS-CoV-2 contamination;

    iii.   applies only to traditional pollution, not to losses resulting from natural catastrophes such as disease outbreaks; and

    iv.    does not otherwise apply under the circumstances of this claim;

e.     Factory Mutual is obligated to cover Amphenol up to the applicable limit of liability of the Policy with respect to, *e.g.*, (i) COVID-19-related losses and expenses already sustained by Amphenol businesses to date; and (ii) COVID-19-related losses and expenses to be sustained by Amphenol businesses as the COVID-19 pandemic continues;

f.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its real property losses, time element losses, extra expense, and other losses sustained as a result of direct physical loss or damage to property due to the SARS-CoV-2 virus and/or COVID-19;

g.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims of EXTRA EXPENSE incurred to continue business during the Period of Liability;

h.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims of time element losses for GROSS EARNINGS or GROSS PROFIT loss, at Amphenol's election;

i.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims of time element losses and extra expense as a result of orders of civil or military authority that have limited, restricted, or prohibited access to insured properties as a result of the SARS-CoV-2 virus and/or COVID-19 at insured property or other locations within five miles;

j.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims of time element losses and extra expense wherever ingress to or egress from insured property has been partially or totally prevented as a

result of the SARS-CoV-2 virus and/or COVID-19 at insured property or other locations;

k.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims for losses and extra expense associated with physical loss or damage to contingent time element locations;

l.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims for response costs and time element losses and extra expense as a result of the actual presence of communicable disease at insured locations;

m.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims for actual loss sustained to prevent loss and costs incurred to temporarily protect against actual or impending physical loss or damage to insured property;

n.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its expediting costs and extra expenses;

o.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its logistics extra costs;

p.     Factory Mutual is obligated under its Policy to indemnify Amphenol for its claims preparation costs;

q.     The threat of physical exposure of property or premises to the SARS-CoV-2 virus that renders property unreasonably dangerous and/or unfit for its ordinary intended purpose constitutes "direct physical loss or damage" under the Policy; and

r.     Actual or suspected exposure of property to the SARS-CoV-2 virus constitutes "direct physical loss or damage" under the Policy.

## SECOND CAUSE OF ACTION
### *For Breach of Contract*

128.   Amphenol repeats and realleges the allegations in the preceding paragraphs.

129.   The Policy is a valid and enforceable contract between Amphenol and Factory Mutual, providing All Risks coverage designed to cover the losses occasioned by the COVID-19 pandemic.

130.   Amphenol is entitled to coverage, up to the applicable limits of liability, of the losses that it has incurred as a consequence of the COVID-19 pandemic.

131.    No terms, conditions or exclusions of the Policy apply to bar or restrict coverage.

132.    Amphenol has complied with or is otherwise excused from all applicable Policy provisions, including payment of premiums, timely notice, timely proof of loss.

133.    Factory Mutual has unjustifiably failed to pay for Amphenol's covered losses and has failed even to state a coverage position.

134.    Factory Mutual is in breach of the Policy.

135.    As a direct and proximate result of Factory Mutual's breach of the Policy, Amphenol has suffered and continues to suffer substantial damages.

136.    Amphenol is entitled to damages as a result of Factory Mutual's breach of the policy, as well as pre-judgment and post-judgment interest and any other costs and relief that this Court deems appropriate, all in an amount to be established at or before trial.

**JURY TRIAL DEMAND**

Amphenol hereby requests a jury trial as to all triable issues in the above-entitled action.

**RESERVATION OF RIGHT TO SEEK CERTIFICATION**

To the extent the fair adjudication of this action requires the resolution of any novel issues of state law, Amphenol respectfully reserves its right to seek certification of such issues to the Connecticut Supreme Court.

**PRAYER FOR RELIEF**

**WHEREFORE**, Amphenol prays for judgment against Factory Mutual as follows:

1.       A declaration of the Parties' respective rights and obligations, including without limitation a declaration with respect to Amphenol's right to coverage under various sections of the Policy to coverage of particular elements of its losses as well as the non-applicability of any defenses that Factory Mutual may seek to assert;

2.       An award of all damages of any nature to which Amphenol may be entitled under contract, in equity or at law;

3.       Pre- and post-judgment interest as provided by law;

4.       An award of attorneys' fees and costs of suit incurred; and

5.       Such other and further relief as the Court deems just and proper.

Dated:  January 21, 2021                        Respectfully submitted,

                                                THE PLAINTIFF,
                                                AMPHENOL CORPORATION
                                                */s/ Fatima Lahnin*
                                                Marc J. Kurzman
                                                Fed. Bar No. ct01545
                                                Fatima Lahnin
                                                Federal Bar. No. ct24096
                                                Carmody Torrance Sandak & Hennessey LLP
                                                707 Summer St., Stamford, CT 06901-1026
                                                Direct: 203-252-2680
                                                Fax: 203-325-8608
                                                MKurzman@carmodylaw.com
                                                FLahnin@carmodylaw.com


                                                */s/Robert J. Gilbert*
                                                Robert J. Gilbert (*pro hac vice application pending*)
                                                Nathan A. Sandals (*pro hac vice application pending*)
                                                Latham & Watkins LLP
                                                200 Clarendon Street
                                                Boston, MA  02116
                                                Phone: (617) 880-4500
                                                robert.gilbert@lw.com
                                                nathan.sandals@lw.com


                                                */s/ David A. Barrett*
                                                David A. Barrett (*pro hac vice application pending*)
                                                Latham & Watkins LLP
                                                555 Eleventh Street, NW
                                                Washington, DC  20004-1304
                                                Boston, MA  02116
                                                Phone: (202) 637-2200
                                                Fax: (202) 637-2201
                                                david.barrett@lw.com